The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. Oyez, Oyez, Oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the 4th Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Be seated. We want to welcome all of you here to the 4th Circuit on Thursday, January 30th. We have two interesting cases this morning. The first one is United States v. Stacks. Mr. Carpenter, good to have you, sir. Michael would be proud of you. Thank you. May it please the Court. The traffic stop in this case violated the Fourth Amendment because Mr. Stacks had not committed any traffic offenses, had not violated any other laws, and with all things considered, the officers had no good reason to believe that criminal activity was imminent. The district court's holding and the government's defense of it on appeal in this case suffer from two... They had a crime wave going on up and down that street, though. Well, we certainly acknowledge that this is an area that was a high-crime area, at least with respect to vehicle break-ins, and there's no doubt that that factor is in. But the Court has repeatedly held that even in high-crime areas and even late at night, those factors alone aren't enough to stop just anyone who's present in that area. There has to be particularized suspicion that the individual is engaged in or about to be engaged in criminal activity. And here, the Court's holding that that standard was met suffers from two overarching flaws. The first is that it's inconsistent with this Court's decision in Foster. And the second is that rather than conduct a true totality of the circumstances analysis, both the district court and the government cherry-pick by ignoring key contextual factors that undermine reasonable suspicion. So if we turn first to the Foster problem, the Court said in that case that the government, quote, must do more than simply label a behavior as suspicious to make it so. That's exactly the problem we have here. The core of the district court's holding is its belief that Mr. Stacks was acting suspiciously by driving through three hotel parking lots without stopping or without ever getting out of his car. But neither the officers on the scene nor the district court nor the government in its appeal has ever articulated why someone looking to break into a car would drive around in that manner. And that's where this case presents a stark contrast with the Terry case that the government relies on. In that case, the officers also observed a peculiar pattern of behavior, two men pacing back and forth in front of a store a dozen times over a 10 to 12-minute span. In that case, though, the officer testified that he recognized that activity. He'd seen it before in his experience surveilling downtown Cleveland. He believed that the men were casing the store and were about to launch an armed robbery attempt. Here, by contrast, these officers testified that they didn't know what Mr. Stacks was doing. They thought it looked as if he was lost. They thought it looked as if he was looking for a clean space because his officer – He thought he was suspicious. Well, but that's not enough to think he's suspicious. I mean, certainly what he was doing was unusual. It was something they didn't see in their other observations. But that's not enough. They need to be able to articulate why that unusual – He was driving slowly, right? I don't think there's anything in the – He was driving by himself. He was driving by himself. He already looked to the right, which was towards the parking lot. He didn't ever look to the left. Well, but everything on the left was – He drove into three or four lots. Everything on the left was closed. On the right, you had three hotels that were open for business. It was 430 in the morning. It was 430 in the morning. But there are lots of innocent explanations for that kind of activity. As the officers themselves said, they thought it looked like he was lost. He gave an innocent explanation. That was he was taking his girlfriend to work. The problem was he didn't have a girlfriend in the car when they saw him. There was certainly some degree of miscommunication or confusion there, and I don't know if Mr. Stacks got nervous and didn't explain himself well or if the officers just misunderstood my understanding of what actually happened that night, although it's not in the record because it's not really relevant, is that he was meeting, actually, a girlfriend there, an out-of-town girlfriend, who'd come to visit and was staying at one of those hotels. That's not what the court found. Well, that's true, and the reason – The facts cited by the court are the ones we have to deal with. I don't question your version, but the facts that the court found are the ones we have to rely on unless they're clear error. That's right, and what he – He told the officers he was taking his girlfriend, he was dropping his girlfriend off at work, but perhaps the inference that I drew is that she must be working at one of these hotels. But they hadn't seen her in the car, and then he gave him his license, driver's license, and said, do you have probable cause? And then he took off, the officer holding his license. That is an accurate recollection of the facts, but the important point here is not what he told them, what he said when he was stopped. The officers needed to have reasonable suspicion before they initiated the stop in the first place. So the reason that he's actually there, while it was an innocent reason, is not relevant. What is relevant is what the officers perceived at the time, and if you look at their testimony, they have never articulated why they thought this driving pattern suggested that he was about to break into a car. If you look at their testimony, what they say is, well, he was doing something unusual, we didn't know what it was, so we wanted to stop him to investigate further. Were the officers limited to just the kind of behavior that would be reflective of why they were there, the breaking of the cars? I mean, if they saw behavior that would indicate some type of criminal activity as a foot, are they able to use that as a basis for reasonable suspicion? In theory, sure, but they didn't articulate any other basis. They didn't say that they thought he was engaged in drug activity. They thought he was engaged in any other kind of activity. All they said is that it looked like he was doing something different. They didn't know. They wanted to investigate further, and the district court's basis was solely relying on the notion that what he was doing was consistent with a vehicle break-in, which was the crime spree that Judge King referenced in this area on this particular street was solely limited to break-ins to vehicles that are parked in these lots. It wasn't a more generalized high-crime area. But any kind of criminal conduct they could have been looking for doesn't make any difference. Reasonable suspicion of something. Something's amiss. Well, reasonable suspicion of criminal activity, not just reasonable suspicion of unusual activity. The court has held again and again in cases like Foster, Massenburg, Sprinkel, that simply because the officers see something that's unusual, that's strange, that they don't recognize, that's not enough unless they can articulate a basis for believing that that unusual activity is likely to be indicative of criminal activity rather than innocent but unusual activity. There was a reasonable inference by the police officers that this methodical driving would indicate maybe he's casing a car. Well, that may be accurate if he had focused on a particular set of cars or if he had done this multiple times. And that's where we have a big contrast. He did multiple times. He drove into, what, three parking lots. Right, but he never focused on a particular set of cars. He simply drove. Why at 430 in the morning? I mean, the fellow driving by himself, slowly, looking to the right, which is where all these parking lots for these hotels were, and he drives through three of the parking lots, slow. Well, again, there are all kinds of innocent explanations for that. But the officers inferred what Judge Floyd said. Well, I think the reason that inference is an unreasonable one is that there's no reason. It's hard to explain why in the world that activity is what someone would do who was looking. If you hypothesize that he's coming here to break into a car, why would he drive around in this manner? It wouldn't allow him to see inside the cars. I mean, he's driving around a little two-door sedan. He can't. It's not as if he's driving a big Escalade or a Hummer where he can peer down into the cars and see what's valuable sitting on the seats. He has no way to see what's inside the cars from his vantage point. And that's where this case presents a very stark contrast with what's happening in Terry, because in Terry it's easy to articulate why what the men were doing would have facilitated them in undertaking an armed robbery. By pacing back and forth in front of this store, they can see the layout of the store. They can determine how many employees are there that day and where within the store they're located. They can identify valuable items around the store that they might steal when they launch their robbery attempt. None of those things. So in that case, there's a very logical and easy-to-see explanation for why what the men were doing would have led to, would have facilitated a criminal act. Here, this unusual activity, driving through these three parking lots, never stopping, never getting out of the car, would not have facilitated Mr. Stacks in breaking into one of these cars. What would have been suspicious is if he had gotten out of his car, walked around the parking lots on foot, peered into these cars. That would have allowed him, you know, that would have, there would be innocent explanations for that potentially, but it would also lead to a reasonable inference that what he was doing was going to facilitate a crime of breaking into one of these cars. And that's missing. That's a difference from Terry. The other overarching problem with the government's analysis is that they omit some key contextual factors that undermine the reasonable suspicion finding. The first thing that the court and the government fail to acknowledge is that at the time of this stop, Mr. Stacks had exited these hotel parking lots and was driving out of the area on West Park Drive. What that should tell us is that even if these officers were concerned while he's driving through these parking lots, that as Judge Floyd said, maybe he's casing a car. When he pulls out of the final lot without ever having stopped and heads out of the area, any concern that he's about to break into one of these cars should have dissipated. And that, again, distinguishes this case from Terry and from this court's decision three years ago in United States v. Glover, which is cited in the briefs. Both of those cases deal with preventive police action like we're dealing with here, where the police haven't observed a criminal offense, they haven't observed a traffic offense, but they make a stop because they think something might be up here in a few minutes. In both Terry and Glover, the courts emphasize that we're dealing with the threat of imminent criminal activity. That's why Terry relies so heavily on the fact that police on the beat need to make instantaneous decisions. Same thing in Glover. Before stopping the defendant, had the officers obtained his license plate number? No, they had not. The testimony was that they began to type in the license plate number as they pulled up behind him but had not finished it by the time that the blue lights were initiated. That's pretty clear. They had his license plate number before they stopped him. They did not have his license plate number until after the blue lights had initiated and he had come to a stop. When they pulled in behind him, they got the rest of him. That's right. They pulled in behind him. The officer's testimony was, I believe it was Officer Overmose driving. Williams was riding shotgun. Williams testified that they pulled in behind the guy, initiated the blue lights, and he stopped, and he had began in the midst of that time to type in the license plate number. It was clear that it hadn't been fully obtained until after the blue lights were on. The other factor that I think the government and the district court omit in their analysis is they put a lot of weight on the nature of Mr. Staxx's reaction when he comes into the police presence. But they failed to acknowledge that at the time he passed this car, it was 4.30 in the night, it was completely dark outside, and the officers were driving with their headlights off. His reaction in that circumstance is unremarkable. I think all of us would react in the same way. We'd look surprised. We would turn to see what in the world is happening with that car that just drove by. The car had its headlights off, but he saw that the fellows in it were in police uniform. He knew they were policemen at that point. They speculated that he knew they were policemen. Obviously, we don't have that. They looked at him closely. They indicated that would be a fair inference. Even if we assume that their speculation is accurate, I want to contrast his reaction here to the type of nervous and evasive behavior that we typically see in these kinds of cases. Normally, the court has said that if people speed away, normally in these cases people speed away, they run away, they hide their faces so that police can't see them, and the court has said, well, that's nervous and evasive behavior that properly factors into the reasonable suspicion calculus. Here, Mr. Staxx did the exact opposite. He turned to look towards them, and he slowed down his car. It leads to the question of how could he have reacted in this situation that wouldn't have been suspicious to the officers. We know from previous cases that if he sped away, if he looked nervous. Any reaction at all, they would have considered suspicious. Exactly, and this court just last year in United States v. Black rejected that kind of false dichotomy where the officers, the Charlotte police officers there had said he was overly cooperative, so we thought that was suspicious. Well, the court said no, no, that puts him on pins and needles. He's uncooperative, he said.  If he's overly cooperative, that's suspicious. If he's speeding, it's suspicious. If he's driving slow, it's suspicious. Exactly, the court rejected that kind of false dichotomy in Black. It should do the same thing here. If he's going south, it's suspicious. If he's going north, it's suspicious. Exactly, and the court has rejected reliance on those kinds of facts before, and we ask it to do the same here. I want to ask you a question, though, before you sit down. You just focused on that one issue, and you've got another issue. If you should prevail on that issue, don't you still have a problem undermining the conviction? So the no is the short answer to that question, but you have a few minutes to explain. I'm not asking you to unify the issue. I just wanted to set that up for the prosecutor. Well, I'm happy to address it on rebuttal, whichever the court prefers. My suspicion is that if you win on your reasonable suspicion issue, that's the end of the case. Well, yes, I think that is the end of the case. I suspect the government is going to say it's not. Indeed, they say that you concede, I think, in your brief, that maybe they still have a case without it. So what the government had said before the suppression motion was decided, that if the initial stop was unconstitutional, what that means is they can't introduce the eyewitness testimony from the officers, which would place Mr. Sachs in the area that night. Without that connection to the area where the gun was found, I think it would be impossible for the government to prove their case. And that's why before the suppression motion was decided, they said, Judge Whitney, if you disagree with us and think this stop was invalid, we'll dismiss the indictment. That's what they said back then. That's what they would prosecute. But now they've got a conviction. But anyway. Well, certainly they could change their mind. We'll take that up if we need to. Mr. Miller, do you agree with all that? May it please the court, William Miller on behalf of the United States. As the district court correctly found, there was ample evidence to support a finding of reasonable suspicion in this case. The defendant has conceded that this area was a hot spot for the exact type of crime, or for vehicle break-ins. And they concede that this time of early morning hour also properly factors into the reasonable suspicious analysis. The key dispute here is over whether or not the defendant's behavior in that environment led to particularized suspicion sufficient to support a stop. And the government's contention is that driving up and down these rows of cars is exactly the same type of suspicious behavior that was presented in Terry. Mr. Carpenter. What? This is exactly the same category as in Terry. This is a Terry case, right on the money. This is a classic Terry case. Mr. Carpenter listed three facts from Terry that went into Officer McFadden's reasonable suspicion in that case. He mentioned the fact that the casing could allow the defendants to take a look at the layout, ascertain the number of employees, and target valuable goods. That's exactly what the defendant in this case could have ascertained from driving up and down these rows of cars. He could get the layout of the parking lots. He could see the number of employees, any cameras that were around. Isn't that speculative? It's a reasonable inference based on the facts. You could draw that from anybody that drives by a car. You could infer that from someone who drives around a parking lot a few times and say, oh, they had a chance to case the cars out, look around and see what was going on. What's different in this case? This is the area where crime has occurred. That's correct, Your Honor, and that's what differentiates this case, Your Honor, is it's 4.30 in the morning when the defendant's engaging in this type of behavior. It's not a crime to drive around 4.30 in the morning. No, and the officers don't have to have even close to a probable cause of a crime to justify a Terry stop. This court has said it doesn't even have to come close to a preponderance of the evidence. But someone who's driving in a car, and as the finding of facts indicate, he didn't stop, he didn't talk to anyone, he never got out of the car. He's just driving his car around. I mean, you've really got to do some inferring to determine he is involved or about to be involved in a crime, particularly for the type of crime they are looking for. Judge Wynn, and in these cases, the experience of the officers and the way they view things, this court does credit their experience. And the two officers in these cases had over 40 years of experience between the two of them. And so their observations of this defendant's behavior and how it's different from everyone else they saw that morning is an appropriate consideration for this court in determining whether... Isn't there such a thing as acting too quickly? I mean, if they kind of stayed in place and this was going to happen, I mean... There could be... They made a decision to move from their spot without their headlights on. If anything looks suspicious, that looks suspicious. And then the court holds it against the defendant to turn his head around. And I don't know what that means. I suppose anybody driving around at 4.30 in the morning, you see another car with headlights around creeping or moving through a lot in this particular area in Charlotte, you would likely turn your head around too. I'd like to address both of your points there, the first being the duration of the observation. The officers in this case did exactly what Terry and this court's president... How long did they observe it? For six to seven minutes, I believe is the testimony. Six to seven minutes from the time his car came into view until they pulled him over. That's correct, Judge King. He was driving a Cadillac. Yes. Does that have anything to do with... I don't believe that was a factor. That's not a factor in the... I was wondering if that factor was driving around in a big Cadillac. No, but what they did observe... In West Virginia, I'd have a lot of people think something about that. Nice car. But what they did observe in that six to seven minutes was that this defendant's behavior was different from everyone else they'd seen. And so by watching him go through all these parking lots and repositioning himself twice... How about the fact that he was always looking one side rather than the other, looking to the right? The fact that he is focused on the hotels and the cars is a fact that factors into the reasonable suspicious analysis here in the totality of the circumstances. By itself, it may not be enough, but that's not... You've got to look at all of it. But the fact that he was driving a Cadillac doesn't come in. It could have been driving an old, crappy Ford or something. I don't know that that was a factor that anyone's referenced at this point that the court relied on below. But to the point about the six to seven minutes of observation, during that time, they did exactly what this court requires, which is to determine whether or not the defendant's conduct is different from a substantial portion of innocent travelers. These officers had seen a half a dozen cars come in the time prior to seeing the defendant. All those folks went straight in, made deliveries, went into the front office. They all had business at the hotel. The defendant, on the other hand, was methodically driving up rows of cars in three parking lots. The defendant cites repeatedly Officer Williams' testimony about the defendant appearing to be lost or like he was looking for a parking space. But that's a mischaracterization of the testimony because Officer Williams went on to say that that was his initial impression, but that after he continued to observe the defendant, he realized that behavior is not consistent with someone who was lost, and the defendant didn't stop at any of the parking spaces. And so to cite that initial impression that the defendant appeared lost or like he was looking for a parking space, that's the type of cherry-picking that the defendant has accused the government of doing. When viewed in its full context, the officers here took their time and observed the defendant long enough to distinguish him from other innocent travelers. And to your second point, Judge Winn, about the defendant's reaction, the officers, during their testimony, certainly said, yes, it would have been fairly normal, I think was the quote, for someone to look at us at that moment, for us to catch their attention. What wasn't normal to them was the defendant's reaction of coming to a near-complete stop, sitting up in his seat, and turning his whole body around 180 degrees and appearing surprised. And so there's no question that if you encounter another vehicle at 4.30 in the morning without your headlights on, you're going to react. Unless you are out there trying to meet somebody and then you happen to see a car and it's got its lights off and you're looking to see if that's who you intend to meet, that seems more consistent than someone who's trying to rob a car. And there may be innocent explanations. It's not the government's responsibility. It wasn't these officers' responsibility to eliminate every possible innocent explanation. The question is whether or not they had reasonable suspicion to stop the defendant to do further investigation. But that's more than just speculation and more than just individuals who are driving around in a parking lot. I mean, that's the average citizen. And I don't think you're held to a standard you've got to conform your behavior to that which other people in the area are doing. You know, we're kind of in a country where you can ride around if you want to and you can do things. And reasonable suspicion is a low threshold, I grant you, but it just seems, you know, why wouldn't they just wait a little longer with all the experience they got and, you know, let this thing progress to a point where they think they have that suspicion? The government's position is they had the requisite reasonable suspicion when they executed the stop. And I agree with you, Your Honor, that the defendant's reaction in isolation would certainly not have been enough to rise to the level. We've even got cases in the Fourth Circuit where if a defendant doesn't react to the officer, that's suspicious. It's interesting. You know, if he reacts, he's suspicious. If he doesn't react, well, a normal person would have reacted. And, you know, I don't know how we deal with those kind of cases. Threshold is pretty low, but it requires a little bit more than just speculation. Right. I think it is important here, Your Honor, that the officers did acknowledge that it would have been fairly normal to have some reaction, but what they saw went beyond what they would have expected. Do you agree that it would be normal for them to react, for him to react when he saw the car without light? Absolutely. I think we would all expect it. Do you agree that it would be normal for him to react somewhat when he saw the car without lights with two uniformed officers inside it? That's the moment that... impersonate police officers. Well, I don't know if that's a... That would cause him to turn 180 degrees. At this point, Your Honor, given that the district court suppressed this evidence, we view the evidence in the light most favorable to the government. We do. I think that would require viewing it in the light most favorable. But that particular part of this thing is the government's construction of it is, you know, kind of troubling. If that was something abnormal or something, when they're running without light in the middle of the night. And I would concede, Your Honor, that in isolation... In isolation, that doesn't help you a lot. That doesn't help us a lot. But I think it's also important that, like all of us, these officers expected some sort of reaction. It would have been fairly normal. But their testimony and what they perceived... We're looking at it from their standpoint. They weren't impersonating officers, and they're analyzing his reaction, whether it was suspicious or not, enough for them to pull him over. And that's the point you got. And that's what Judge Whitney had to deal with. I mean, he was concerned about this, too, when he had a couple of hearings and tried to get you all to stipulate or work something out. Judge Whitney's concern was whether or not there was an alternative basis to affirm. Right. I think his order very clearly states that there was ample evidence to justify the statement. But it took a while to get around. He had two hearings, right? That's correct. And in our district, that's not atypical with Judge Whitney. That's not atypical. That is not atypical. That's a routine kind of thing. We are frequently called upon to provide additional briefing for the Honorable Judge Whitney in our district. And I don't think he would mind me saying that. The other point that the defendant makes... And he's a former prosecutor. He was a U.S. attorney down there. Yes, Your Honor. And was an assistant for a long time. He's seen a lot of these cases. That's right, Judge King. The other point that the defendant makes is that there was no specific testimony where the officers explicitly said that this methodical driving up and down the rows of cars is exactly what we were out there looking for. And although there may not be that specific statement, it is the inevitable conclusion based on this testimony in this case. And the district court found twice that the defendant's behavior was in light of the officer's training and experience consistent with largely from automobile and consistent with the type of crime typical of that area at that time of night. And I think a complete reading of Officer Overman and Officer Williams' testimony leads to that inevitable conclusion. Right in the middle of Officer Overman's description of the defendant's conduct, he reaffirmed that the surveillance that night was designed to stop people from breaking into cars. That's at page 36 of the Joint Appendix. And similarly, the prosecutor asked Officer Williams, what were you looking for when you were out there doing this surveillance for break-ins? And he said, we were looking for something out of the ordinary. He then described what was ordinary and contrasted that with the defendant's behavior. And so it's not a fair characterization of this record to say that somehow the officers failed to articulate why this behavior was suspicious. And in these types of cases, it's also fair to look at trial testimony and how the testimony there comes out as well. And during his trial testimony, Officer Overman was asked, what was the basis for the stop? And the very first thing he mentions is that they were out there to detect and prevent vehicle break-ins. I would submit to the court that it would have been irresponsible for these officers not to have at least stopped the defendant long enough to... When they stopped him, where was he going? I mean, was he coming out of the lot? And I'm glad you asked that question, Your Honor. That's an important clarification as well. At the time when the officers passed the defendant, he was headed straight into the dead end of a cul-de-sac. And so when he turned around and they initiated the stop, he was headed back toward the main road, but he also was going past all three of those hotels again. And the defendant says that this is something that... Which would indicate the possibility he would turn in and do a crime or...? He was going right past the same three hotels he had just cased the parking lots of or at least driven up and down the rows of cars. And the defendant says that the fact that he's headed back in that direction somehow distinguishes this from Terry. But the defendant and Terry made the exact same argument. Well, then he's seen the officers in these uniforms. He's probably been alerted to the fact that there he's headed out and they stop him. If you say they're there trying to prevent him from breaking in a vehicle, he's headed out. And there's no requirement the officer just merely has to make his presence known to stop the behavior. I mean, that wasn't the standard in Glover. You know, the officer didn't have to just go stand by the parking lot attendant to get this guy to move on about his way. Once the officers have that suspicion, they're justified in conducting a stop to investigate it. Well, all these cases are fact-intensive. And, you know, we can write it any way you want. Bumpers is a good example of that. Talk about the Sprinkle argument. Certainly. Which is where Judge King is headed back. Your Honor, if I just may briefly finish the point about the Terry case. In Terry, the defendant also argued that the men were walking away. But what the court says is, although the trio had departed the original scene, there was nothing to indicate abandonment of an intent to commit a robbery at some point and that it was, therefore, reasonable to conduct the stop. And so that's not a distinction from Terry. I just wanted to make that clear. As to your question about Sprinkle, Judge Floyd, that case, even if the stop were determined to be unlawful, the evidence of the defendant's identity and jail calls would nevertheless be admissible in light of Sprinkle. And the reason for that is... Would you have to retry the case? Wouldn't you have to go back and retry it though? Because there'd be a bunch of evidence, all that evidence, about that stop would have to come out, wouldn't it? No, Your Honor. The reason is that the facts that... You'd be entitled to show that he ran. You'd be entitled to show that he was... And you're going to have to put that in context perhaps. Correct. So that places the defendant at the scene. But there'd have to be some kind of a harmless error analysis to figure out whether the conviction's any good. That's what I was trying to get at with... Right. That's what I was setting you up. Right. And the critical pieces of evidence here are the defendant's presence... If this thing's effective, that would be the crux of this position. That's right, Judge King. And the critical pieces of evidence here are the defendant's presence in that area, which, in light of Sprinkle, would be admissible given that the new crime purges the taint of the arguably unlawful stop. And so here you would have the defendant's presence there that night, and critically, you would also have the jail calls where he then speaks about the gun, talks about tossing the gun. All of that evidence would still come in. And those are the critical links to the finding of guilt in this case. The driving in and out of the parking lot is the basis for the reasonable suspicion, but the only reason the prosecutor admitted that evidence during the trial, and she says as much during the transcript, is just to provide context for the stop, to let the jury know that this wasn't just a random pulling over. You tried the case without that evidence, you're saying. Absolutely, and the defendant... If you had done that, you wouldn't have had this... We've been arguing for 25 minutes about the thing that you say didn't have anything to do with it. Well, the government firmly believes there was reasonable suspicion in this case, and at that point, the district court... You're saying it doesn't have anything to do with the case. He was convicted of possession of a firearm that he was never seen with, correct? That was found the next day in the shrubbery. Correct. And so the critical links in the testimony are the defendant's presence there that night and the jail calls. The defendant objected to the prosecutor going... I mean, that's evidence of guilty mind. Right, and the crime, the intervening crime that purges the taint. The defendant objected below to the officer testifying about the basis for the officer's reasonable suspicion. And so we know from the record the relevance of that testimony in the government's mind because she says that she was just putting that in there to indicate to the jury that this wasn't an unfounded stop. And so it was really just context. But they have tainted the whole thing. If it's bad, why wouldn't it taint the prospect of getting a fair trial? Well, under... He acted suspiciously driving up and down the road there in the middle of the night and was stopped and all that stuff, if that is, in fact, without reasonable suspicion. Well, under a harmless error analysis... Some would have to be suppressed. Stuff related to that would be subject to suppression. That's what Mr. Carpenter is saying. But then the question is, what's left, and is there enough left to sustain the conviction, or would you have to do it over if you wanted to? And the language of Sprinkle is that the intervening illegal act purges the taint of the initial stop. And so in this case, the officer's observations of the defendant, they would still be admissible. They would still be admissible. There's no reason why that would be suppressed, their firsthand observations of what happened. The evidence of his identity was what was obtained by the stop. His license, driver's license. You got that by stopping him illegally, assuming, in other words, they don't give up their position at all, but assuming that there's something wrong with it. No, and this case is on all fours with Sprinkle, because the officers observed the defendant in the car, and then when they went up and approached him, and as this court found, unlawfully stopped him, he took off running. And so there was nothing about what happened before that prevented the government from proving what happened after, the shooting and the intervening unlawful act. And so Sprinkle really is on all fours with this case. And if I may just briefly address the State v. Swift that the defendant has cited as somehow undermining the Sprinkle case, that's a 1992 North Carolina Court of Appeals case where the court actually affirmed the denial of the motion to suppress. And so the defendant cites that for the proposition. Sprinkle's our case after that. It's after that and the proposition that the defendant cites about somehow you get a license to commit a crime when you're unlawfully stopped, that's actually dicta in Swift itself, which is a 1992 Court of Appeals case. And so there's nothing about Swift that undermines the rationale of Sprinkle. You don't get license to commit another crime to get away from officers based on your judgment that the stop was unlawful. And so this case truly is on all fours with Sprinkle. And so the government would ask that the court affirm the denial of the motion to suppress based on the ample evidence of reasonable suspicion. And in the alternative, the court may affirm on the basis of Sprinkle. Let me ask one other question. Neither one of you talked about the expert testimony or the non-expert testimony. You all in your brief sort of concede that that's error, but it's probably harmless. We do not. Don't shake your head no because that's exactly what you say. Even assuming if there were error, it would be. You go right to the point that it's harmless error. Well, what we argued is this is not arbitrary or irrational, which is the standard at this point under abuse of discretion. And what the court was doing there, we do argue in the brief, Your Honor. You immediately go to harmless error. My recollection is that we argue that... And you may well be right, but that's... The court made all... Excuse me. The court made all the requisite findings under Rule 702. That's the heading. That's the heading in your brief. Item 2. The district court did not plainly err. That's actually an error. By not certifying him as an expert. That's a misstatement in the heading. That's a typo. It really is. It really is a typo because I didn't even assert plain error underneath that. Well, I know you didn't, but it didn't mean error. It didn't err. Well, the fact that the word gun was used in one of the conversations makes all that other stuff kind of irrelevant. That's correct. It was used by the defendant and by the other individual on the call, but... Whether or not it was correctly articulated in the brief, the government's position is that he was admitted as a 702... He was properly... The evidence was admissible, but it was admitted under the wrong rule. He was an expert rather than a lay witness. That's your position, isn't it? What Judge Whitney's ruling, what he was going for, and he does this in other cases as well, is to make the findings under Rule 702 that the witness is qualified based on training and knowledge and experience. What he doesn't do is give them the stamp of expert in front of the jury. So he's trying to help the defendant. Correct. It's a ruling in favor of the defendant. That's a good explanation. In his discretion, he didn't label him as an expert because that would have been prejudicial to the defendant. He was trying to help the defendant. Correct. And even if I didn't explain it well in my brief, he explains that in the record. That's the reason he's doing it. But he really is finding that he's a 702 witness rather than a 701, but he's letting the jury think he's a 701 witness, which is a lay opinion. But he didn't need any expert, as Judge Boyd correctly points out, because he talked about a gun. He's talking about an iron, a burner. I mean, you don't need a lot of common sense. The jurors come in there with common sense. Especially when in the next line he's actually referring to it as a gun. I mean, from the context, it's clear. All right. Let me just ask on the Sprinkle case. Yes. The Sprinkle case was an instance where officers approached the defendant looking to pack down or something to that effect. The defendant then attempts to run, but he also pulls out a gun, and then he shoots at the officers. And the court says, it's that crime of shooting at the officers that makes it a distinct one. And here what you have is a defendant who, if we hold in that manner, has been illegally stopped. And so in the presence of being illegally stopped, he leaves. He peels out, tires squealing, and was charged with reckless driving. He was driving so fast that the officers ran back to their car, and the testimony is gave it everything it's got and never saw him again. And so it's certainly not as egregious as shooting at the officers. We would never maintain that. But it is an intervening unlawful act that puts the community, the defendant, the officers at risk. He's an individual who has been illegally stopped in an area of high crime by individuals who are in uniform, but they're riding around in a car with no lights on at night. And what Sprinkle, the analysis of this court, says is the defendant's judgment of the legality of the stop does not give him license to commit a new crime. It seems that Sprinkle really turned on the fact that guy turned around and shot at those officers. I mean, that's a real crime. That's totally distinct from what's happening here. That had nothing to do with the pat-down of the stop. But leaving has everything to do with an illegal stop, whether you squeal, touse, or whatever. That's part of the stop. But turning around and shooting a gun at someone is a totally distinct crime. It's certainly more egregious, but the government doesn't concede that. Shoot a gun at the officers. Absolutely. And we are not analogizing driving off. But the Sprinkle analysis. I haven't found any other cases like that. That's what I'm trying to figure out. We've got the Sprinkle case, but have we found anything else that simply just indicates drove away? Whether speeding, tires, or whatever. It wasn't in a manner to endanger the officers. He was actually leaving the officers. Never endangered the officers. Never did anything to them. He just left them. Wow. And that's a... It's almost like they created the crime. Had they not stopped him illegally, he wouldn't have had a cause to speed away. Judge, when the... Which is totally different than if he pulls out a gun and starts shooting. That's... There's not going to be any excuse in the world for doing that. Sprinkle, to my knowledge, has not been applied in other public cases. Published cases in this circuit. The same analysis has applied in other circuits. And... I thought it had. In published decisions. As to this issue, I know Sprinkle is often cited. Yeah, okay. I mean, I think I've cited it. Well, and then that's a lot of time that's legality. I think I remember working on that case. But it could have been an unpublished case. I don't recall. But Sprinkle's applied for the initial stop all the time. All right. Well, I just would say, Your Honor, that the act of driving away is exactly an unlawful act. And the defendant doesn't get to make a judgment. I mean, we've sat here and briefed this thing and talked about it. It wasn't the running away they focused on because the guy turned around and he ran away from them. They said the crime was turning around and shooting that gun at him. That's a distinct crime. Distinct crime. Running away is part of what is going on here. If you have an illegal stop, then you kind of feel a citizen might have a right to walk away from an illegal stop. And that would be a totally different fact pattern. But not to turn around and shoot a gun. You don't have that. That's a distinct crime. Correct. And that's a different fact pattern, walking away. But Sprinkle does say the defendant doesn't get to make a judgment about the legality of the stop and then take his own action at that point. They charged him here the next morning with obstruction. Correct. They issued warrants and he was arrested on those warrants. For obstruction? For obstruction and reckless driving, which is also an arrestable offense. Obstruction and reckless driving. Correct. But they charged him with obstruction for running away. Yes, obstruction and reckless driving. And reckless driving for driving away fast. Correct. A distinct crime. For leaving, they charged him with obstruction of justice. Correct. And then the distinct crime. All right. Thank you, Your Honor. Thank you, Mr. Miller. We appreciate it. Mr. Carpenter? So I'd like to make a couple of quick points about the reasonable suspicion before then turning back to Sprinkle. The first is to clarify, I think Mr. Miller may have misspoke when he said that at the time they met him, he was headed into the dead end at the cul-de-sac. That's not right. If you look at the government's brief, even at page 5, they acknowledge that at the time, Stacks had pulled out of the third hotel parking lot and was proceeding the opposite way on West Park. So that's confirmed everywhere in the record if you look at the testimony. The other point, the government relies on the fact that Officer Williams first said, well, he looked like he was lost, but then he discounted that possibility because he hadn't stopped for directions. The notion that you have to stop for directions these days is a relic from the 80s. Today, if you're lost, you pick up your cell phone and you call someone and say, hey, where am I going, where was I supposed to meet you? Or you punch your address where you want to go into Google Maps. It's totally unreasonable. He might have one of those Google Maps in there. Exactly, and so the fact that he didn't stop can't be the basis for eliminating the possibility that he was simply lost. It's just unreasonable for the officer to use that as the basis. I want to touch quickly also on bumpers, which Judge Floyd mentioned. There are a couple of key distinctions between this case and bumpers. The first is that in bumpers, the officers believed that they had just observed an illegal activity. They believed that they had just seen the men trespassing. And so they stopped to investigate whether that crime that they thought had just happened had in fact happened. Here, the officers are taking purely preventive action. They don't say that he committed a traffic offense. They don't say that they saw him commit any kind of offense. This is a case where they're doing a preventive stop, and so I think bumpers is distinguishable on that ground and also on the ground that the men there unquestionably took evasive action by walking briskly away from the officers, which, again, we have the opposite here, slowing down, turning towards the officers. I want to get to the Sprinkle Doctrine because there was a lot of talk about that. The first thing I want to say, Judge King, you ask about whether we have to retry the case, and the answer is absolutely yes. The government doesn't even argue in its brief at any point that this error was harmless. They never argue for the court to affirm on that basis. The court should consider any argument to that effect to be abandoned, and it wouldn't have merit anyway. But you're saying we can't consider Sprinkle. No, we can consider Sprinkle, surely. We can consider the harmlessness of the illegal stop. I don't think you can consider harmlessness in the sense of a retrial is not required. So what do we have to do? We have to send it back for a retrial? I think it would have to be sent back. The government would make a decision as to whether they think they can prove their case without the evidence that must be suppressed. If you look at the Supreme Court's decisions in Murray, it outlines what happens in a situation like this. It says the exclusionary rule extends to, quote, testimony concerning knowledge acquired during an unlawful search. That means the officers can't testify as to their observations during the search, which means they can't testify to placing him in the area that night. It also applies to evidence that is otherwise acquired as an indirect result of an unlawful stop. That's exactly what we have here. We have a direct causal chain. Unlawful stop leads to the issuance of an invalid warrant, which leads to the unlawful arrest the next morning, and the jail calls that were then made are also a part of that very direct causal chain. I thought that we have some cases that say that if there's an error, even though the government doesn't argue harmlessness, we can consider it. Why wouldn't we just have to if we can't reverse on an error unless it affects the substantial rights of the defendant? So the Rule 52, I think it is, brings harmlessness into it. If you look at the Powell decision from 2011, and I know, Judge King, I think you dissented in that one, but I think Judge Floyd was on the other side. A footnote in that case, Judge Shedd notes that an oral argument, the government had raised an issue, an alternative basis for affirmance. And a footnote, Judge King says there, when the government doesn't raise it in its brief, we will consider it abandoned. I think that's what the court should do here. I said that or Judge Shedd? I think it was Judge Shedd. Pardon? Judge Shedd. Judge Shedd. You didn't dissent on that point. Okay. Regardless, the fact that the officers were able to testify about what happened during that was a critical point in their case. I mean, as Mr. Miller acknowledged. Maybe that's different, though, from harmlessness because what Rule 52, if I've got the right number, it says even though no error will be recognized unless it affects the substantial rights of the defendant. So if there is error and it doesn't affect your client's substantial rights, conviction would be affirmed. So that brings in an analysis of whether the error was prejudicial. Well, I'll concede that for the moment and go to Sprinkle because I think that's really the crux here, and there was a lot of sort of confusion about that. Our argument, first of all, is not that the swift decision from the North Carolina Appellate Court somehow undermines Sprinkle. We think Sprinkle doctrine, I mean, it is what it is. If the person commits a new and distinct crime, that purges the taint. The problem here, the reason Sprinkle doesn't apply. If the disability is governed by the federal rules anyway, it wouldn't be governed by North Carolina. Exactly. So there's no way that the North Carolina courts could overturn that anyway. But the key point here is that under North Carolina law, his flight did not constitute a new and distinct crime. If you look again at State v. Swift, that sets out what is a North Carolina crime, and as Judge Winn pointed out, the key in Sprinkle was the person fired a shot, which Judge Michael noted in that decision was a violation of South Carolina law. There is no violation of North Carolina law here if you conclude that the stop is illegal. As Swift itself said. He could take off without obstructing justice. He can take off without obstructing justice. If he stopped illegally under North Carolina law, his flight, according to Swift, cannot be considered as a circumstance to establish probable cause for arrest. That applies both to the obstructing arrest and to the reckless driving arrest. There's a case directly on that point in North Carolina law that I regret I didn't cite in the briefs, but I should have. It's State v. Williams. The citation is 231, Southeastern Reporter 2nd, 282. It's a 1977 appellate court case in North Carolina. It's setting out the law of North Carolina. Cites a previous decision in Borland for the proposition, and I want to quote here, the defendant could not be convicted for reckless driving and speeding when the offense was committed in fleeing to avoid an unlawful arrest. That's exactly what happens here. If you conclude that this initial stop was invalid, then his flight was not in any way a criminal offense under North Carolina law. It's clear under Swift and under Williams that the two warrants for obstruction and reckless driving that were issued were invalid if the initial stop was invalid. That's why all of the evidence, including the jail calls at the end. That's basically saying you have a right to run from the police. Under North Carolina law, absolutely do. In fact, under North Carolina law, That's an interesting legal principle. It is, but North Carolina law is North Carolina law, and Sprinkle turns not on the mere act of flight, but on the commission of a new and distinct crime. Judge Michael footnoted in that decision that the court did not need to address the issue of whether flight alone would be a sufficient basis to purge the taint of an unlawful stop. This court has not subsequently decided that issue, and again, the government does not raise that issue as an alternative basis. It doesn't say flight alone was enough. It, like Judge Whitney, relies solely on the Sprinkle Doctrine, which only applies if you have a new and distinct crime. So for that reason, and again, I would point to the court also to footnote three in Judge Whitney's opinion, where he says, well, I think these jail calls are admissible. That's the only thing that his alternative holding extends to. He kind of reserves the question of whether identity evidence by itself would come in, and it sort of suggests that he would have to decide that down the road. That's another reason the court would need to send it back so that Judge Whitney could flesh out in the first instance exactly what degree of identity evidence comes in. Thank you. Thank you very much, Mr. Carpenter. We appreciate it. We'll come down to Greek Council and then call the next case.
judges: Robert B. King, James A. Wynn, Jr., Henry F. Floyd